## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

### v.

## O & G SPRING AND WIRE FORMS SPECIALTY COMPANY, Defendant.

### No. 85 C 9966.

United States District Court,
N.D. Illinois, E.D.

Jan. 26, 1990.

John Hendrickson and Mary B. Manzo, U.S. Attys., E.E.O.C., and Kathleen Mulligan, Chicago, Ill., for E.E.O.C.

Andrew W. Levenfeld, Gerard C. Smetana and Philip T. Powers, Levenfeld & Aronson, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

In this Title VII action the court on December 14, 1988, entered Findings of Fact and Conclusions of Law that defendant, O & G Spring and Wire Forms Specialty Company ("O & G"), "(1) be found liable for discriminating against blacks as a class on account of their race in both recruitment and hiring for certain entry level factory jobs which amounted to a pattern and practice of disparate treatment of blacks, and (2) be found liable for having established and carried out policies and practices of recruitment as to such jobs that had a disparate adverse impact on blacks which constituted a pattern and practice of discrimination for the years 1979 through 1985." 705 F.Supp. 400 (N.D.Ill.1988). (Findings of Fact and Conclusions of Law, pp. 22–23)

On May 22, 1989, the court denied O & G's motion for a new trial but modified the Findings of Fact and Conclusions of Law to make clear that the Equal Employment Opportunity Commission ("EEOC") had proved a pattern and practice of discrimination on both disparate impact and disparate treatment theories by a preponderance of evidence.

■ Now O & G has brought the decision of *Wards Cove Packing Co. v. Atonio,* —— U.S. ——, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), to the court's attention and suggests that the conclusions in this case can no longer stand. The parties have extensively briefed this case, as well as the Seventh Circuit cases of *Evans v. City of Evanston,* 881 F.2d 382 (1989) and *Allen v. Seidman,* 881 F.2d 375 (1989), which have offered insight on how to interpret *Wards Cove.* These cases collectively hold that in addition to showing a imbalance between the racial composition of the qualified persons in the labor market and the qualified persons holding the jobs at issue, a plaintiff in disparate impact cases must identify specific employment practices that impact a protected group. Once the plaintiff has done so a burden of production falls on the employer to demonstrate a "legitimate employer purpose" for the suspect employment practice and it is no longer necessary that the practice be "essential" or "indispensable". *Wards Cove,* 109 S.Ct. at 2126. Once the employer has met this burden of production, the plaintiff must establish by a preponderance of the evidence that either the employer's alleged business justification is a pretext for unlawful discrimination or that alternative practices are available that will achieve the same business ends with less racial impact. *Id.,* at 2125.

■ With these principles in mind, we shall review the evidence offered in this case. First, although the relevant labor market for O & G was never clearly established by plaintiff (Findings of Fact, Nos. 20–23, 29–31, 36–37), the court found that there were significant numbers of blacks in the labor market serving O & G. (Finding of Fact No. 40) Second, the EEOC established that a specific employment practice, viz., recruitment by word of mouth communicated through its current employees, had a substantial disparate impact on minority employment because a large percentage of its employs were white.[1] (Finding of Fact No. 16). Third, O & G established several business justifications for its recruitment procedure, viz., it cost no money; it produced a high percentage of Polish immigrants with high school technical training which insured O & G of a pool of people that would be willing to work under bad conditions and low pay; it provided people with technical training, while unneeded for the jobs at issue, nevertheless created a pool of employees that could be promoted from within to the more skilled positions without the necessity of a formal training program. (Finding of Fact Nos. 37–39)

---

1. The employees that were not recruited by word of mouth it is agreed were "walk-ins", i.e., were looking for a job and walked in the door and asked for a job or an employment application.

The court however ruled that the EEOC had proved disparate impact because "no explanation is sufficient to overcome the 'inexorable zero' employment of blacks by O & G during the years 1979 through 1985". (Finding of Fact No. 40) Thus a fair reading of the court's decision in this regard shows that the court felt that O & G had the burden of persuasion on this issue.[2] Therefore a reconsideration is in order.

Upon reconsideration the court feels that its Findings of Facts show that O & G did establish legitimate business reasons for recruiting workers for its unskilled positions by word of mouth. This practice provided O & G with a ready source of employees who would be willing to work at low pay and under the poor conditions that its jobs offered. Further, the Polish-born workers for the most part had received technical training in school in Poland that served O & G well in providing it with a supply of workers who could graduate to the more skilled positions without having to institute a formal training program or seek outside recruitment.

Therefore, on reconsideration, the court finds that the EEOC did not carry its burden of persuasion on its claim that the specific hiring procedure employed by O & G, namely, recruitment by word of mouth, did not have a legitimate business purpose or that alternative means were available to achieve the same business ends with less racial impact.

However on the claim of disparate treatment, the court notes that O & G itself claims that a majority of its employees hired during the relevant period were walk-ins off the street. (*See Defendant's Memorandum in Response*, pp. 3–6). In fact, O & G contends that approximately two-thirds of its hires during the relevant period were obtained in this manner. During this period in question (1979 through 1987) ninety-nine people were hired for the low-skilled positions in question. Of these, only five were black and all of the blacks were hired during the last two years of the relevant period, which was after the EEOC filed this discrimination claim. Findings of Fact Nos. 12 and 14. Furthermore, available applications [3] indicate that at least one-eighth of the applicants were black. (Findings of Fact No. 13) If the word of mouth applicants are factored out, the percentage of black "walk-in" applicants off the street rises to almost 20 percent, near to what Dr. de Vise said was the percentage of the relevant labor market. (Findings of Fact Nos. 19–23) O & G put forth several justifications for its failure to hire a single black walk-in during the period 1979 through 1985. It only hired walk-ins from applications that had been accepted during a two-week "window" period because the type of workers from whom it received applications were very transient and it would be a waste of time to work form applications which were stale. The EEOC's labor market statistics were too imprecise to rely on, although its expert, Dr. Glen Meyers ("Meyers"), failed to provide alternative statistics. (Findings of Fact Nos. 29–30).[4] Finally O & G claimed that the blacks who did apply were interested in immediate work only, and when none was available, did not want to fill out applications, but were content to request validation of their unemployment compensation work search forms.

The EEOC responded that its labor market statistics were in fact accurate, and the EEOC provided anecdotal testimony of black persons who in fact had applied to O & G and were turned down. The EEOC also emphasized that once this claim was

---

2. In the court's order denying O & G's motion for a new trial, the Findings of Fact and Conclusions of Law were modified to include a specific finding and conclusion that the EEOC had established unlawful discrimination by a preponderance of the evidence. However this finding and conclusion was divorced from a consideration of the specific employment practice involved but considered the whole employment picture presented by O & G.

3. O & G's employment applications are only available for the year 1983 and thereafter. The applications for prior years were legally destroyed.

4. Meyers felt that the EEOC should have conducted a survey within a five-mile radius of the O & G plant to identify the race of workers who have jobs similar to those offered by O & G.

filed against O & G its employment practices changed: The number of black applicants and hires dramatically rose after the filing of this complaint. twenty-seven out of one hundred fifty-four applicants were black and five out of twelve hires were black during the years 1986 and 1987. O & G attempted to explain this phenomenon by arguing that the neighborhood had undergone a marked racial change, there was a marked decline in employment in the immediate area, and a flea market opened across the street that drew many black customers.

The court however found that the EEOC's statistical evidence, while not perfect, nevertheless established a profound imbalance between the relevant market and O & G's hires. (Finding of Facts No. 40) In addition, EEOC's statistics certainly meet the minimal requirements of *Wards Cove* by comparing apples to apples. 109 S.Ct. at 2122. O & G did not offer alternative statistics but was content to rely on its criticism of those offered by the EEOC. See *Allen v. Seidman*, 881 F.2d at 379. The statistical probability using standard deviation analysis of no black hires during the period 1979 through 1985 was infinitesimal. Finding of Fact nos. 25 and 40. The Court finds therefore that the EEOC identified a specific employment practice of O & G, i.e., walk-in hires, which O & G utilized in a discriminatory manner to refuse to hire black applicants. Thus, the EEOC also established causation, *Watson v. Ft. Worth Bank & Trust Co.*, 487 U.S. 977, 108 S.Ct. 2777, 2788, 101 L.Ed.2d 827 (1988). O & G plainly and simply refused to hire blacks for the unskilled positions. The proof was in the statistical probabilities. As stated in *Wards Cove*,

> "[W]here 'figures for the general population might ... accurately reflect the pool of qualified job applicants.' cf. *Teamsters v. United States*, 431 U.S. 324, 340, n. 20, 97 S.Ct. 1843, 1856 n. 20, 52 L.Ed.2d 396 (1977), we have even permitted plaintiffs to rest their prima facie cases on such statistics as well."

109 S.Ct. at 2121 n. 6.

The EEOC's statistics are in fact corroborated by the anecdotal evidence as well as through the actual hiring record of O & G since the filing of the complaint. O & G could have avoided liability in this case if it had hired black walk-ins on the same basis as it hired white walk-ins, as it apparently does today. It strains credulity to argue that not once during the years of 1979 through 1985 did a black walk in at a time that there was a job opening, if in fact two-thirds of all O & G employees were hired in this way. The issue is "whether at the conclusion of the trial the evidence pro and con liability supports a finding of violation." *Allen v. Seidman*, 881 F.2d at 379. The evidence here does reaffirm the court's original Conclusion of Law that O & G engaged in a pattern and practice of disparate treatment of blacks in its hiring practices during the years 1979 through 1986. Therefore O & G's motion to reconsider the court's finding of a pattern and practice of disparate treatment of blacks is denied.

IT IS SO ORDERED.